UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Bankruptcy Case 16-82933 |
| William Perez, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| William Perez, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 18-96030 |
| | ) | |
| State Bank, | ) | |
| | ) | |
| Defendant. | ) | Judge Thomas M. Lynch |

MEMORANDUM OPINION

Less than three months after Debtor William Perez commenced this case, State Bank's counsel filed four reaffirmation agreements signed by the Debtor and by counsel for State Bank. The court conducted a hearing to review the four agreements on March 20, 2017, at which the Debtor, represented by counsel, appeared and testified. From this testimony the court concluded that any presumption of undue hardship had been rebutted. Orders reflecting this finding with respect to each of the four reaffirmation agreements were signed March 22, 2017 and entered the following day. On April 4, 2017, the Debtor received his chapter 7 discharge and the case was closed.

Eighteen months after Mr. Perez received his discharge, he asked the court to reopen this bankruptcy case so that he could bring this adversary proceeding against State Bank.  His adversary complaint seeks declaratory relief regarding the meaning and effect of three of the Reaffirmation Agreements.[1]  It asks the court to declare: (I) that the "amounts of debt reaffirmed by the Debtor under the Reaffirmation Agreements are fixed at the amount expressly set forth by the Terms After Reaffirmation contained in Section G of each Reaffirmation Agreement," (II) that the "Reaffirmation Agreements do not contemplate any existing default prior to their effective date" and any "enforcement action taken as to defaults on any of the Reaffirmation Agreements must be the result of a post-Reaffirmation default only," and (III) that "any pre-Reaffirmation arrearages existing prior to the execution and effective date of any of the Reaffirmation Agreements were not reaffirmed and were thereby discharged in the underlying Chapter 7 proceeding." (Compl., ECF No. 1.)

State Bank answered and the parties have each filed cross-motions for summary judgment, which have been fully briefed and argued.  For the reasons discussed below, the court finds that there is no genuine dispute as to any material fact and will enter summary judgment on all counts.[2]

---

[1] According to the Complaint, an order of judgment of foreclosure has been entered against the property relating to the fourth agreement.  Accordingly, that "particular Reaffirmation Agreement is not at issue in this Adversary Proceeding." (Compl., ECF No. 1, ¶12.d n.1.)

[2] As discussed below, the questions presented by the complaint necessarily involve a detailed and careful reading of the agreements as affirmed.  The parties recognized this and, during oral argument on September 2, 2020, their attorneys conceded that in resolving the cross-motions the court could reach more than a binary "yes/no" answer to the questions presented in the complaint, and in declaring the meaning of the agreements the court could determine closely-related questions, such as actual dollar amounts as of certain dates.

# I.  JURISDICTION

District courts have "original but not exclusive[3] jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11." 28 U.S.C. § 1334(b).  Although the Debtor received a discharge and his bankruptcy case was initially closed in April 2017, proceedings "arising under title 11" or "related to cases under title 11" may arise after closure of the case.  "A post-discharge motion that seeks a ruling on the effect of an alleged reaffirmation agreement is a proceeding that arises under Title 11." *In re Grabinski*, 150 B.R. 427, 432 (Bankr. N.D. Ill. 1993) (analyzing statutory predecessor to 11 U.S.C. § 1334(b)).  On the Debtor's motion, the court reopened the bankruptcy case for purposes of filing this adversary proceeding. (Case No. 16-bk-82933, ECF No. 55.)  The Debtor, through this adversary proceeding for declaratory relief, seeks just such a ruling.  If not for the reaffirmation of the pre-petition debts to State Bank, and to the extent not reaffirmed, the Debtor's personal liability on the reaffirmed debts would have been discharged.  Therefore, to the extent that the Debtor seeks declaratory judgment as to the extent that his pre-petition debts to State Bank were reaffirmed, this is a "core" proceeding. *See* 28 U.S.C. § 157(b)(2)(I) (core proceedings include "determinations as to the dischargeability of particular debts"), (O) (core proceedings include "other proceedings affecting the . . . adjustment of the debtor-creditor . . . relationship").  To the extent that the Debtor

---

[3] Although the court finds that it has jurisdiction to issue the requested declaratory judgments regarding the interpretation of the reaffirmation agreements, the court emphasizes that such jurisdiction is not exclusive.  Although agreements reaffirming pre-petition debts are governed in part by section 524 of the Bankruptcy Code, "state courts have the jurisdiction to determine whether a valid reaffirmation has occurred before the bankruptcy court when a creditor sues a debtor to enforce an allegedly reaffirmed debt*." In re Grabinski*, 150 B.R. 427, 432 (Bankr. N.D. Ill. 1993).

seeks declaratory judgment as to other terms modified by the reaffirmation agreements, such determination "relates to" the bankruptcy case and is a "non-core" proceeding within the court's jurisdiction. For such interpretation is of an agreement provided for by section 524(c) of title 11 and submitted to and ruled upon by this court in the bankruptcy case in accordance with such section. *See, e.g., Brown v. Calumet Meat Co. (In re Moo & Oink, Inc.)*, 2012 WL 1414834, at *5 (Bankr. N.D. Ill. Apr. 20, 2012) ("A civil proceeding is 'related to' a bankruptcy case, for jurisdictional purposes, when the action between the parties affects how much property is available for distribution to creditors of the bankruptcy estate or allocation of property among such creditors, or if the outcome could alter the debtor's rights or liabilities.").

In accordance with 28 U.S.C. § 157, the district court has referred the matter to this court pursuant to Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. So referred, this court may enter final orders and judgment on all core proceedings, 28 U.S.C. § 157(b)(1), and "with the consent of all the parties to the proceeding" may do so for non-core proceedings, 28 U.S.C. § 157(c)(2). The court may also decide so-called "*Stern* claims submitted to them by consent." *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, ___, 135 S. Ct. 1932, 1949 (2015). *Stern* claims are those designated by 28 U.S.C. § 157(b)(2) as "core" but for which as a constitutional matter litigants have "the right to Article III adjudication." *Id.* at 1944. The parties have consented to entry of final judgment by this court. (Answer, ECF No. 9, ¶ 3; Bank Mem., ECF No. 64, 2; Debtor SOF, ECF No. 71, ¶ 3; Bank Resp. to SOF, ECF No. 75, ¶ 4.)

## II.  FINDINGS OF UNDISPUTED FACTS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), incorporated by Fed. R. Bankr. P. 7056. "Whether a factual dispute is genuine turns on whether 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Douglas v. Reeves*, 964 F.3d 643, 645-46 (7th Cir. July 7, 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In making that determination, the court must "construe all facts, and draw all reasonable inferences from those facts, in favor of the nonmoving party," and does not "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts." *Kurtzhals v. Cty. Of Dunn*, 969 F.3d 725, 727 (7th Cir. 2020).

To assist the court, the court's local rules require the movant to include a statement of uncontested facts with the motion, together with specific references to affidavits, parts of the record or other supporting materials relied upon to support those facts. Bankr. N.D. Ill. R. 7056-1.  The respondent must file a concise response to each statement of fact and a statement of any additional facts that the respondent contends will support opposition to the motion.[4]  This statement must include, in the case of "any disagreement, specific references to the affidavits, parts of the record and

---

[4] At oral argument on September 2, 2020, the parties indicated that to avoid duplication they did not allege additional facts in support of their responses where such fact was already alleged in the statement of facts filed with each of their respective cross-motions.  As such, both parties invited the court to consider undisputed facts alleged in either of the cross-motions when determining whether or not to grant either motion as if such allegations were repeated in each of their submissions.

other supporting materials relied upon." *Id.* 7056-2(A)(2)(b).   The rule further provides that all material facts presented in the moving party's statement "will be deemed to be admitted unless controverted by the statement of the opposing party." *Id.* 7056-2(B).  The Seventh Circuit has consistently upheld a trial court's "discretion to require strict compliance with Local Rule 56.1," *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015), including by deeming statements admitted where the nonmovant fails to include specific reference to affidavits or other parts of the record that support denial, *Friend v. Valley View Cmty. Unit Sch. Dist. 365U,* 789 F.3d 707, 710 (7th Cir. 2015).

The court finds the following facts contained in the parties' submissions under Local Bankruptcy Rules 7056-1 and 7056-2 are either undisputed or deemed admitted based on the failure to properly controvert the facts as required by Fed. R. Bankr. P. 7056(c) and the related Local Bankruptcy Rules:[5]

1.     The Debtor filed his chapter 7 petition for relief on December 21, 2016. (Bank SOF ¶ 1.)

2.     Defendant State Bank is a banking association that maintains its primary office in the State of Illinois. (*Id.* ¶ 2.)

3.     State Bank is a secured creditor of the Debtor which at all times relevant held perfected mortgage liens on the real properties located in Harvard and McHenry,

---

[5] The following sets forth this court's findings of fact as required by Fed. R. Bankr. P. 7052. Adjudicative facts may also be found and determined later in this Memorandum Opinion.

Illinois, identified in the Complaint in which Debtor holds an interest. (*Id.* ¶ 3.)[6]

4.     On the petition date, the Debtor was past due for the following: (a) the December 1, 2016 installment on the note secured by the Streit Property (the "Streit Loan"); and (b) the November 1, 2016 payments on the notes secured by the Pleasant Property and the Hayes Property (the "Pleasant and Hayes Loan"), and  the Blackman Property (the "Blackman Loan"). (*Id.* ¶ 5.)

5.     On or about February 2, 2017, the Debtor and the Debtor's counsel signed a separate reaffirmation agreement for the Streit Loan, the Pleasant and Hayes Loan, and the Blackman Loan (collectively, the "Reaffirmation Agreements"). (*Id.* ¶ 10.)

6.     Each of the Reaffirmation Agreements were prepared on Official Forms 427 and B240A, with State Bank completing Part I and the Debtor completing Parts II, III, and IV of the instruments. (*Id.* ¶¶ 8-9.)

### *The Streit Loan and Reaffirmation Agreement.*

7.     As of January 4, 2017, the Streit Loan was in arrears for the December 1, 2016 installment and the total payoff amount for the loan was $269,951.80. (*Id.* ¶ 11.)

8.     The cover sheet for the Streit Reaffirmation, signed by the Debtor and State Bank, states that the debt on the date of the petition was $269,331.62, and the amount to be paid under the reaffirmation agreement is $269,951.90, to be paid

---

[6] There is no dispute over the further description of the properties found in the Complaint, and the nomenclature used by the parties to identify each property in their pleadings — namely, the "Streit Property," the "Blackman Property," the "Pleasant Property" and the "Hayes Property" — is adopted for purposes of this opinion.

"$1,957.00 per month beginning 12/1/16 and continuing thereafter pursuant to the terms of the Note and Mortgage." (Streit Reaff. Agt., Debtor SOF ¶ 39, Ex. A, ECF No. 71.)

9. The Streit Loan Reaffirmation Agreement states that $269,951.90 "is the entire amount that you are agreeing to pay," which amount "may include unpaid principal, interest, and fees and costs (if any) arising on or before 1/4/17, which is the date of the Disclosure Statement portion of this form." (Streit Reaff. Agt., Debtor SOF ¶ 39 Ex. A; Bank SOF ¶ 17, ECF No. 66.)

10. Part I of the Streit Reaffirmation Agreement describes the original agreement being reaffirmed to be "the Note dated 5/13/13, Mortgage recorded 5/22/13, and Rider"; lists $269,951.90 as the "Amount Reaffirmed"; states that 4.625% is the applicable annual fixed percentage rate "applicable to the Amount Reaffirmed"; and states that the Reaffirmation Agreement Repayment Terms are "$1,957.00 per month beginning 12/1/16 and continuing thereafter pursuant to the terms of the Note and Mortgage." (*Id.*)

11. Where asked in Part I.G to "Specify the changes made by this Reaffirmation Agreement to the most recent credit terms on the reaffirmed debt and any related agreement," the instrument lists the same annual percentage rate of 4.625% and monthly payment of $1,957.00 for both the "Terms as of the Date of Bankruptcy" and the "Terms After Reaffirmation." (*Id.*)

*The Pleasant and Hayes Loan and Reaffirmation Agreement.*

12.     As of January 6, 2017, the Pleasant and Hayes Loan was in arrears for the November 1, 2016 installment and the total payoff amount for the loan was $99,849.06. (Bank SOF ¶ 11.)

13.     The cover sheet for the Pleasant and Hayes Reaffirmation, signed by the Debtor and State Bank, states that the debt on the date of the petition was $99,585.06, and the amount to be paid under the reaffirmation agreement is $99,849.06, to be paid "$1,152.00 per month beginning 11/1/16 and continuing thereafter pursuant to the terms of the Note and Mortgage." (Pleasant and Hayes Reaff. Agt., Debtor SOF ¶ 40, Ex. B; Bank SOF ¶ 18.)

14.     The Pleasant and Hayes Loan Reaffirmation Agreement states that $99,849.06 "is the entire amount that you are agreeing to pay," which amount "may include unpaid principal, interest, and fees and costs (if any) arising on or before 1/6/17, which is the date of the Disclosure Statement portion of this form." (*Id.*)

15.     Part I of the Pleasant and Hayes Reaffirmation describes the original agreement being reaffirmed to be "the Note dated 5/6/11, Mortgage recorded 6/28/11, and Rider"; lists $99,849.06 as the "Amount Reaffirmed"; states that a fixed Annual Percentage Rate of 6.0% "is applicable to the Amount Reaffirmed"; and states that the Reaffirmation Agreement Repayment Terms are "$1,152.00 per month beginning 11/1/16 and continuing thereafter pursuant to the terms of the Note and Mortgage." (*Id.*)

16. Where asked in Part I.G. to "Specify the changes made by this Reaffirmation Agreement to the most recent credit terms on the reaffirmed debt and any related agreement", the instrument lists the same annual percentage rate of 6.0% and monthly payment of $1,152.00 for both the "Terms as of the Date of Bankruptcy" and the "Terms After Reaffirmation." (*Id.*)

### *The Blackman Loan and Reaffirmation Agreement.*

17. As of January 6, 2017, the Blackman Loan was in arrears for the November 1, 2016 installment and as of that date the total payoff amount for the loan was $62,143.80. (Bank SOF ¶ 11.)

18. The cover sheet for the Blackman Reaffirmation, signed by the Debtor and State Bank, states that the debt on the date of the petition was $61,979.00, and the amount to be paid under the reaffirmation agreement is $62,143.80 to be paid "$691.00 per month beginning 11/1/16 and continuing thereafter pursuant to the terms of the Note and Mortgage. (Blackman Reaff. Agt., Debtor SOF ¶ 41, Ex. C; Bank SOF ¶ 19.)

19. The Blackman Reaffirmation Agreement states that $62,143.80 "is the entire amount that you are agreeing to pay," which amount "may include unpaid principal, interest, and fees and costs (if any) arising on or before 1/6/17, which is the date of the Disclosure Statement portion of this form." (*Id.*)

20. Part I of the Blackman Reaffirmation describes the original agreement being reaffirmed to be "the Note dated 4/1/11, Mortgage recorded 4/1/11, and Rider"; lists $62,143.80 as the "Amount Reaffirmed"; states that a fixed Annual Percentage

Rate of 6.0% "is applicable to the Amount Reaffirmed"; and states that the Reaffirmation Agreement Repayment Terms are "$691.00 per month beginning 11/1/16 and continuing thereafter pursuant to the terms of the Note and Mortgage." (*Id.*)

20.    Where asked in Part I.G. to "Specify the changes made by this Reaffirmation Agreement to the most recent credit terms on the reaffirmed debt and any related agreement", the instrument lists the same annual percentage rate of 6.0% and monthly payment of $691.00 for both the "Terms as of the Date of Bankruptcy" and the "Terms After Reaffirmation." (*Id.*)

*Facts Concerning all of the Reaffirmation Agreements.*

22.    Neither the Debtor nor any agent on his behalf made any request to State Bank or its agents to modify any of the notes, mortgages, or payment schedules prior to or during the execution of the Reaffirmation Agreements. (Bank SOF ¶ 12.)

23.    There was no communication or any discussion between State Bank or its agents or the Debtor or his agents prior to or during the execution of the Reaffirmation Agreements regarding modification of the notes or mortgages or deferral of any pre-petition or post-petition payment defaults. (*Id.* ¶ 13.)

24.    Each of the Reaffirmation Agreements defined "Amount Reaffirmed" as:

the total amount of debt that you are agreeing to pay (reaffirm) by entering into this agreement. The total amount of debt includes any unpaid fees and costs that you are agreeing to pay that arose on or before the date of disclosure, which is the date specified in the Reaffirmation Agreement (Part I, Section B above). Your credit agreement may obligate you to pay additional amounts that arise after the date of this disclosure. You should consult your credit agreement to determine

whether you are obligated to pay additional amounts that may arise after the date of this disclosure. (Reaff. Agts., Part V.)

25.    Each of the Reaffirmation Agreements referenced incorporated and attached the relevant note and mortgage, and each were filed with the court on March 2, 2017. (Bank SOF ¶¶ 16, 21.)

26.    On each of the Reaffirmation Agreements the Debtor marked that he "believe[s] this Reaffirmation Agreement is in [his] financial interest and [he] can afford to make the payments on the reaffirmed debt." (Reaff. Agts., Part II.D.)

27.    On each Reaffirmation Agreement the Debtor signed and certified that:

(1) I agree to reaffirm the debt described above.

(2) Before signing this Reaffirmation Agreement, I (we) read the terms disclosed in this Reaffirmation Agreement (Part I) and the Disclosure Statement, Instructions and Definitions included in Part V below;

(3) The Debtor's Statement in Support of Reaffirmation Agreement (Part I above) is true and complete;

(4) I am entering into this agreement voluntarily and fully informed of any rights and responsibilities; and

(5) I have received a copy of this completed and signed Reaffirmation Documents form.

(Reaff Agts, Part III; Bank SOF ¶¶ 9, 10.)

28.    The bankruptcy case closed after discharge, on April 7, 2017.

29.    The Debtor did not make any payments to State Bank between the date of the petition, December 21, 2016, and March 15, 2017. (Bank SOF ¶ 22.)

30.    The Bank does not dispute that the Debtor made certain payments on the reaffirmed loans between March 23, 2017 and October 2017, but disputes the amount then owing – primarily because the parties now disagree on whether additional payments were required under the terms of the reaffirmed loans.

31.     On January 11, 2018, State Bank initiated foreclosure proceedings in state court against the Debtor on the Streit Property, the Pleasant and Hayes Properties, and the Blackman Property. (Debtor SOF ¶ 49.)

## III.  DISCUSSION

### A.  Effect of Reaffirmation.

There are instances where a debtor may choose to relinquish the protections of discharge to continue to enjoy use of the collateral securing a debt if her creditor is willing to accept payment over time rather than presently enforce its rights against the collateral.   Especially "when the cost of foreclosing on a security interest is factored in," an undersecured creditor might "like to collect the debt directly from the debtor rather than liquidate their security interest," while the "debtor may prefer to retain the property in which his creditor holds a secured interest." *Cox v. Zale Del., Inc.,* 239 F.3d 910, 912 (7th Cir. 2001).   In such situations, the Bankruptcy Code permits debtors and creditors to enter into an agreement to reaffirm the debt.  To be enforceable, however, the reaffirmed agreement must comply with the requirements of 11 U.S.C. § 524(c).[7]  The same section also gives the debtor the right to rescind such an agreement "at any time prior to discharge or within sixty days after such agreement is filed with the court, whichever occurs later." 11 U.S.C. § 524(c)(4). Additionally,  where  a  presumption  of  undue  hardship  arises  because  the

---

[7] The section requires, among other things, that the agreement be made prior to entry of discharge, the debtor is provided certain required disclosures, the agreement is filed with the court, and if the debtor is represented by counsel, the attorney certifies that the agreement represents a  fully informed and voluntary agreement by the debtor, does not impose an undue hardship on the debtor or dependents, and the attorney "fully advised the debtor of the legal effect and consequences of" such agreement and of "any default under such an agreement." 11 U.S.C. § 524(c).

reaffirmation agreement indicates that the debtor's net income is not sufficient to make the required payment, the court may hold a hearing within 60 days after the reaffirmation agreement is filed and may disapprove the agreement if the presumption is not overcome. 11 U.S.C. § 524(m).[8] The purpose of these requirements is "is to help assure that the agreement is voluntary on the debtor's part rather than coerced and does not put such a crushing weight on his shoulders that it prevents him from making the 'fresh start' that is one of the goals of bankruptcy law." *Cox*, 239 F.3d at 912.

While Section 524(c) does not forbid the parties from modifying the terms of the debt by agreement during the course of reaffirmation, that section does not empower a debtor or creditor to force the other into agreement without their consent. Implicit in section 524(c)'s "repeated reference to an 'agreement'" is "the requirement that the creditor as well as the debtor consent to the reaffirmation." *In re Turner*, 156 F.3d 713, 718 (7th Cir. 1998). As the Seventh Circuit makes clear, "unilateral statements of reaffirmation" filed without the consent of creditors "cannot be understood as the mutual 'agreement' that" section 524(c) requires. *Id.* at 719.

The parties in this case do not dispute that the requirements of section 524(c) were satisfied in regard to the Reaffirmation Agreements at issue. Nor has anyone challenged or sought to vacate or modify this court's orders finding the presumption of undue hardship rebutted and the agreements not disapproved. Instead, the Debtor

---

[8] This section does not apply if the creditor is a credit union, 11 U.S.C. § 524(m)(2), but it is undisputed that State Bank is not a credit union.

principally argues that the Reaffirmation Agreements modified the terms of the underlying debts, including both the amount reaffirmed and the repayment terms.

### B. Objective Analysis of Contract Formation.

"[S]tate law determines rights and obligations when the Code does not supply a federal rule." *In re Wright*, 492 F.3d 829, 832 (7th Cir. 2007) (citing *Butner v. United States*, 440 U.S. 48 (1979); *Travelers Cas. & Surety Co. v. Pac. Gas & Elec. Co.*, 549 U.S. 443 (2007); *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15 (2000)). Where the Bankruptcy Code uses the term "agreement" without defining the term, it should be given "its ordinary meaning." *Turner*, 156 F.3d at 719. Because the Bankruptcy Code does not supply a federal rule on that issue, the court looks to state law.

The parties agreed at oral argument that all relevant contacts point to Illinois to supply principles of contract law. All of the real property connected to or securing the reaffirmed debts is located in Illinois, the Bank's primary office is located in Illinois, and this bankruptcy case is brought in Illinois by the Debtor who has resided here at all relevant time.

"Illinois courts evaluate contract formation under an objective theory." *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 711 (7th Cir. 2019) (citing *Vill. of S. Elgin v. Waste Mgmt. of Illinois, Inc.*, 810 N.E.2d 658, 670 (Ill. App. Ct. 2004)). Under the objective theory, intent "refers to the objective manifestations of intent in the words of the contract and the actions of the parties" and does not "encompass one party's purely subjective understandings of which the other party is unaware." *Id.*

(internal citations and quotation marks omitted).[9]  Further, under Illinois law "if a contract only permits one interpretation, that meaning controls." *Bank of Commerce v. Hoffman*, 829 F.3d 542, 546 (7th Cir. 2016).  Only if "a contract's language is reasonably or fairly susceptible to multiple meanings" will a court "find the contract ambiguous" under Illinois law. *Id.*  In making the determination "whether an agreement is ambiguous, the court must construe that contract as a whole." *Id.* at 546-47.

### C.  Count III: The Arrearage Is Not A Separate Debt And Was Not "Discharged."

It is helpful to begin the examination of the Debtor's request for declaratory relief by examining the tendency seen in his pleadings and motion to mix certain incompatible terms.  This is most pronounced in Count III which seeks a determination that "any pre-Reaffirmation *arrearages* existing prior to the execution and effective date of any of the Reaffirmation Agreements were not reaffirmed and were thereby discharged in the underlying Chapter 7 proceeding." (Compl. at 11 (emphasis added).)

The problem is that *debts* are discharged, not "arrearages." *See* 11 U.S.C. § 727(b) (with certain exceptions, a "discharge under [Section 727(a)] discharges the debtor from all debts that arose before the date of the order for relief").  Black's Law Dictionary defines "arrear" as:

---

[9] *See also id.* at 712 (citing *Hotchkiss v. Nat'l City Bank of New York*, 200 F. 287, 293 (S.D.N.Y. 1911), *aff'd, Ernst v. Mechanics' & Metals Nat. Bank of City of New York,* 201 F. 664 (2d. Cir. 1912) (holding that "acts or words must be 'reasonably interpreted' as they would by 'ordinary men' and that 'whatever was the understanding' of the parties 'is of not the slightest consequence'").

1. The quality, state, or condition of being behind in the payment of a debt or the discharge of an obligation <the creditor filed a lawsuit against the debtor who was in arrears>. — Also termed *arrearage*. 2. An unpaid or overdue debt <the creditor reached an agreement with the debtor on settling the arrears>. 3. An unfinished duty <the arrears of work have accumulated>.

ARREAR, Black's Law Dictionary (11th ed. 2019). When speaking of debts, an arrearage refers to the quality of being behind on repayment terms or schedule. While it can refer to an amount – the amount of missed payments or the amount necessary to cure a default – that amount is a subset of the debt owed. It is not separate and apart from the underlying debt. If a borrower borrows $12,000 to be repaid without interest in 12 monthly payments of $1,000 and then fails to make the first two payments, the arrearage is $2,000 (ignoring, for simplicity, any fees, costs or other amounts that may accrue under the terms of the agreement). That arrearage refers to the fact that payments totaling $2,000 have come due. The arrearage is not a debt separate from the total debt but is part of the debt. In order to cure the default in this hypothetical, the borrower must pay the $2,000 arrearage. But the total debt is still $12,000.

Because the arrearage is not separate from the debt, the fact that an agreement to reaffirm the debt does not specifically mention an arrearage does not objectively manifest an intention that the portion of the debt then in arrears under the terms of the agreement is "discharged." Waiver of a payment default is not generally a reduction of principal. Here, each of the Debtor's notes contain the following language: "(D) No Waiver By Note Holder. Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described

above, the Note Holder will still have the right to do so if I am in default at a later time." (Reaff. Agts., Note ¶ 6)  Based on similar language, Illinois courts have found that even where the lender did "not require the defaulted borrower to pay immediately, it still retains the right to do so at a later time." *HSBC Mortgage Servs., Inc. v. Galic*, 2017 IL App (1st) 143504-U, ¶ 20 (citing *LaSalle National Bank v. Helry Corp.*, 136 Ill. App. 3d 897, 904 (1985).

Neither the pleadings nor the materials submitted with either party's summary judgment motion identify an objective manifestation of any cancellation or forgiveness of the indebtedness then in arrears in the Reaffirmation Agreement,[10] leaving the Debtor to urge the court to presume such intent from the lack of reference to the amount in arrears.  Nothing in the Reaffirmation Agreements indicates that any portion of the indebtedness constituting an arrearage was to be discharged, cancelled or forgiven.  To the contrary, each of the agreements specify the "amount reaffirmed" as a monetary figure which included "unpaid principal, interest, and fees and costs (if any) arising on or before" the specified disclosure date in the agreement. Thus, like in *In re Gavitt*, here, too, the "fact remains that the prepetition arrearage accrued under the original mortgage is still part of the reaffirmed debt and was not discharged in the bankruptcy." 514 B.R. 243, 253 (Bankr. S.D. Ohio 2014).

---

[10] For example, the Debtor does not offer extrinsic evidence of such objective manifestation, such as tax returns disclosing cancellation of a portion of the indebtedness, which may constitute income for tax purposes and may trigger reporting obligations for the lender under the tax code. *See, e.g.,* 26 U.S.C. § 6050P; 26 C.F.R. § 1.6050P-1(b)(2)(F) (identifiable event includes "discharge of indebtedness pursuant to an agreement between an applicable entity and a debtor to discharge indebtedness at less than full consideration").

D. Count I: The Reaffirmation Agreements Did "Fix" The Amount
   Reaffirmed, But Only As Of The Reference Date Stated In The
   Agreements.

Count I of the Complaint is somewhat ambiguous regarding its request for a determination that the amounts of debt reaffirmed were "fixed at the amount expressly set forth" in the Reaffirmation Agreements. For example, "fixed at the amount" can mean the sum as of a certain point in time or mean an amount "fixed" permanently so to be applicable at any point in time.[11] The Debtor is not clear as to the meaning he urges for the determination of the debt in either his complaint or his motion for summary judgment. But the court need not dwell on that issue because the Reaffirmation Agreements are clear and unambiguous on this point.

Each of the agreements list a specific monetary amount in Part I.B after "AMOUNT REAFFIRMED": $269,951.90 for the Streit Reaffirmation, $99,849.06 for the Pleasant and Hayes Reaffirmation, and $62,143.80 for the Blackman Reaffirmation. In the same section, each of the agreements clarifies that this amount "may include unpaid principal, interest, and fees and costs (if any) <u>arising on or</u>

---

[11] There is also potentially a difference between fixing the amount solely with respect to reaffirmation – which would limit the personal liability on the debt but not necessarily the rights against the collateral to the extent there is sufficient value in the collateral – or with respect to the underlying debt in whole. If a debtor reaffirms $8,000 of a $10,000 debt to lender secured by Blackacre worth $20,000, may lender pursue the full $10,000 debt against Blackacre? The agreements at issue here all state that the amount reaffirmed "is the entire amount that you are agreeing to pay." But the court need not reach that issue today. For each of the Reaffirmation Agreements, the cover sheet states an amount to be paid under the reaffirmation agreement which is greater than the amount listed as the total amount of the debt as of the petition date, so there is no indication on the record either that the "Amount Reaffirmed" was a reduction in indebtedness or that the Bank is seeking to collect any such reduced amounts. Nor is there any indication on the record that the value of the collateral properties exceeds the respective amounts reaffirmed. The issue, therefore, does not appear to be a ripe or live controversy, nor does the Debtor expressly ask for such determination in his complaint.

before" the specified Disclosure Date.[12] (emphasis added.) Part 1.B. of each agreement

further expressly cross-references the definition of the term "Amount Reaffirmed" in

Part V, Section C which defines the term as:

> **"Amount Reaffirmed"** means the total amount of debt that you are agreeing to pay (reaffirm) by entering into this agreement. The total amount of debt includes any unpaid fees and costs that you are agreeing to pay that arose on or before the date of disclosure, which is the date specified in the Reaffirmation Agreement (Part I, Section B above). Your credit agreement may obligate you to pay additional amounts that arise after the date of this disclosure. You should consult your credit agreement to determine whether you are obligated to pay additional amounts that may arise after the date of this disclosure.

(Reaff. Agts.)  If the Debtor means to contend that the Reaffirmation Agreements

permanently fixed or set a ceiling on the amount of indebtedness reaffirmed, he fails

to account for the instruments' express recognition that the "credit agreement may

obligate [the debtor] to pay additional amounts that arise after the date of this

disclosure." (Reaff. Agts., Part V, Section C.1.)

None of the Reaffirmation Agreements indicated a modification of the

repayment terms.  Instead, Section 1.D states in each that repayment begins on a

specified date prior to the Disclosure Date and "contin[ues] thereafter pursuant to

the terms of the Note and Mortgage." (*Id.*, Part I.D.)  Furthermore, each of the

agreements lists a fixed annual percentage rate of interest "applicable to the Amount

Reaffirmed" in Part I.C, which figure is restated in Part I.G under "Terms After

Reaffirmation."  In each case, this is the same rate listed under "Terms as of the Date

---

[12] The reference date listed for the Streit Reaffirmation is "1/4/17," and for the Pleasant and Hayes Reaffirmation and the Blackman Reaffirmation is "1/6/17."  This Memorandum will refer to the relevant date as the "Disclosure Date."

of Bankruptcy" in Part I.G.   Therefore, the agreements are clear that the indebtedness could increase above the amount stated as "Amount Reaffirmed" through the post-Disclosure Date accrual of interest and other costs or fees provided for under the terms of the original loan agreements.

At oral argument, counsel for the Debtor conceded that late fees and interest could accrue on the reaffirmed debt after the "effective date" of the Reaffirmation Agreements but contended that the amount reaffirmed was "fixed" until such date. With this argument, the Debtor identified as the agreements' "effective date" the date the court entered orders finding the presumption of undue hardship rebutted, March 23, 2017, relying on Part V.A.6.a.i. of the Reaffirmation Agreements.   That form provision, applicable to this case, states:

> your Reaffirmation Agreement becomes effective when it is filed with the court unless the reaffirmation is presumed to be an undue hardship. If the Reaffirmation Agreement is presumed to be an undue hardship, the court must review it and may set a hearing to determine whether you have rebutted the presumption of undue hardship.

(Reaff. Agts.)

The express terms of the Reaffirmation Agreement do not support this argument.  The three agreements are clear that the amount listed as the "Amount Reaffirmed" is as of the Disclosure Date stated in the agreement.   The three Reaffirmation Agreements are unambiguous that it is the Disclosure Date — not the effective date — that distinguishes the already accrued interest and fees which must be included in the stated total amount to be reaffirmed from any subsequently accruing interest and fees which are added to the amount of reaffirmed indebtedness.

Neither party asks for a calculation of the current indebtedness, leaving that issue for the state foreclosure court. Accordingly, as for Count I, this court will find and declare only that the amounts reaffirmed by the Reaffirmation Agreement is the amount stated in the agreements as of the Disclosure Date, plus any interest or fees or costs provided for in the underlying loan agreements which accrue subsequent to the Disclosure Date.

### E. Count II: The Reaffirmation Agreements Did Not Cancel Pre-Existing Defaults Or Defer Missed Payments To An Unspecified Date.

The Adversary Complaint's remaining count seeks a declaration that the Reaffirmation Agreements "do not contemplate any existing default prior to their effective date" and any "enforcement action taken as to defaults on any of the Reaffirmation Agreements must be the result of a post-Reaffirmation default only." (Compl. at 9-10.) After identifying the particular Note and Mortgage being reaffirmed, however, each of the Reaffirmation Agreements specify the changes to the "most recent credit terms on the reaffirmed debt and any related Agreement," but do not disclose any provisions for existing defaults. (Reaff. Agts. Part I.A, G.) Each lists in the section entitled "Reaffirmation Agreement Repayment Terms" the amount to be paid "per month beginning 11/1/16 and continuing thereafter pursuant to the terms of the Note and Mortgage." (*Id.,* Part I.D.)[13] The underlying Note for each Reaffirmation Agreement states that failure to make the set monthly payment in full on the date due is an event of default. (Reaff. Agts., Note ¶ 6.)

---

[13] Or, for the Streit Reaffirmation Agreement, 12/1/16.

The Debtor admits that for each of the debts he reaffirmed, he did not make any payments from December 21, 2016, his petition date, to March 15, 2017. While the Debtor made some regularly scheduled payments after the effective date of the Reaffirmation Agreements, he does not contend that he ever made additional payments to catch up for any of the missed payments due prior to the March 2017 effective date of the Reaffirmation Agreements. Instead, he argues that the Reaffirmation Agreements modified the original term and payment schedules for the underlying loans, deferring the missed payments until some unspecified later date.

This argument is not supported by the terms of the Reaffirmation Agreements. Nowhere do they state that the payment terms of the reaffirmed debts will be extended beyond the original repayment schedule. To the contrary, the agreements select the box in Part I.D. of the form[14] which incorporates the terms of the original note and mortgage, stating that the "Reaffirmation Agreement Repayment Terms" are:

- "$1,957.00 per month beginning 12/1/16 and continuing thereafter pursuant to the terms of the Note and Mortgage" for the Streit Reaffirmation Agreement;
- "$1,152.00 per month beginning 11/1/16 and continuing thereafter pursuant to the terms of the Note and Mortgage" for the Pleasant and Hayes Reaffirmation Agreement; and
- "$691.00 per month beginning 11/1/16 and continuing thereafter pursuant to the terms of the Note and Mortgage" for the Blackman Reaffirmation Agreement.

Considering, for example, the Blackman Reaffirmation Agreement, the Debtor admits that he did not pay the November 1, 2016 installment due on the note secured

---

[14] Indeed, the alternative provision contained in Part 1.D. of the form agreements to "Describe repayment terms, including whether future payment amount(s) may be different from the initial payment amount" was not selected by the Debtor.

by the Blackman Property or otherwise make a payment on the note between the petition date and March 15, 2017. Therefore, the first payment date set forth in the Blackman Reaffirmation Agreement coincides with the first payment missed under the loan, consistent with there being no modification of the original payment schedule by the reaffirmation agreement. The other Reaffirmation Agreements are substantially similar on this point.

Similar to the bankruptcy court in the recent *Chandler* decision, this court is left to conclude from the undisputed facts that the debtor chose to enter into reaffirmation agreements that "reiterated the terms of the original loan agreement, and neither party contracted to forgive the payment she had already missed." *Chandler v. Peoples Bank & Trust Co. of Hazard*, No. 6:17-CV-00050-GFVT, 2018 WL 1473800, at *7 (E.D. Ky. Mar. 26, 2018), *aff'd*, 769 F. App'x 242 (6th Cir. 2019). As the Sixth Circuit explained in *Chandler,* where a reaffirmation agreement "differs from the original agreement, the reaffirmation agreement controls, but if the agreements do not specifically differ, the original agreement controls." 769 F. App'x at 246. "Entering into a valid reaffirmation agreement fully restores the rights of the creditor and permits enforcement of the debt in case of default." *Id.*

Nor does the Debtor explain, if his argument were to be accepted, how he believes the terms of the original loans were modified by the Reaffirmation Agreements. The original loans all had maturity dates thirty years after the date of the notes and had been amortized to pay principal and interest during that term. The Reaffirmation Agreements have nothing extending or modifying the maturity dates

of the loan, and instead expressly state that payments are to be made "pursuant to the terms of the Note and Mortgage." (Reaff. Agts., Part I.D.)   Nor do the Reaffirmation Agreements increase the monthly payments in an amount necessary to reamortize the loans within the original term or provide for the missed payments to be added to the final payment on the original maturity date.

The Debtor argues that it was unrealistic to expect him to cure his arrearage upon approval of the Reaffirmation Agreements in order for him to avoid default.  But if Mr. Perez, who was represented by counsel during this process, did not have the intent or the ability to make those payments, he should not have entered into an agreement that required them.[15]

The Debtor next argues that he believed that the payment schedule would be modified, and thus at the very least there was no "meeting of the minds" for an enforceable agreement to exist.  Illinois does require "a meeting of the minds or mutual assent as to the terms of the contract." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016) (quoting *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d. 306 (1987)).  But Illinois uses "an objective approach" to the question of contract formation, and the parties do not need to "share the same subjective understanding as to the terms of the contract." *Id.*  A party "who signs a written contract is presumed to have notice of all of the contract's terms." *Id.*

---

[15] It is not disputed that there was no discussion with State Bank or its agents regarding modification of the notes or mortgages or deferral of any defaults during the preparation of the Reaffirmation Agreements. (Bank SOF ¶13.)

It is undisputed that the Debtor signed each of the Reaffirmation Agreements, in each case specifically certifying that "I am entering into this agreement voluntarily and fully informed of my rights and responsibilities." (Reaff. Agts., Part III.)  Mr. Perez was represented by counsel, who for each agreement signed a certification that he had "fully advised the debtor of the legal effect and consequences of this agreement and any default under this agreement and any default." (Reaff. Agts., Part IV.).  As discussed above, the Reaffirmation Agreements are clear that they do not modify the repayment schedule for the underlying debt, but rather incorporated the original payment terms.  Accordingly, this court must find that there is no genuine issue as to the objective proof demonstrating formation of these contracts.

The Debtor also seems to suggest that the Bank seeks to impermissibly hold him in a default on the Reaffirmation Agreements before they were effective.  While his proposition may be conceptually accurate, it ignores the undisputed fact that the Debtor was already in default on the underlying loans which he reaffirmed. The Reaffirmation Agreements incorporate the repayment terms of the underlying loan agreements without modifying them.  It is not disputed that he had not cured the payment defaults when the Reaffirmation Agreements became effective.  Thus, this argument is of little practical consequence because the pre-reaffirmation default was carried over by the agreements to become a post-reaffirmation default by his failure to cure or otherwise provide for the default.  Additionally, it is undisputed that the Bank did not commence its enforcement action until January 2018, almost a year after the Reaffirmation Agreements became effective.  While the Debtor alleges that

he made certain regularly scheduled payments after March 2017, he does not contend, let alone identify admissible evidence to show, that he had cured the arrearage.

It was the Debtor's choice to voluntarily enter into the Reaffirmation Agreements and by doing so to assume responsibility to make the payments called for. The Bankruptcy Code provided the Debtor an additional 60 days after filing the Reaffirmation Agreements to reconsider that choice and rescind the agreements. 11 U.S.C. § 524(c)(4). He did not. Instead, the Debtor now suggests that the court should not have found the presumption of undue hardship rebutted and permit him to reaffirm these debts because, he now contends, he lacked the ability to cure his arrearage. But the Debtor and his counsel appeared at the reaffirmation hearing where they indicated he would be able to make required payments under the agreements.[16] This court declines the Debtor's invitation now to revisit his decision to reaffirm. As the district court noted in *Chandler*, where a debtor is represented by counsel, a court is not required to find the agreement is in the debtor's best interest "so long as the attorney representing the debtor declared that he or she advised the debtor of the consequences of the agreement and that the agreement did not pose a hardship to the debtor." *Chandler*, 2018 WL 1473800, at *2 n.2.

### F. The Cases Cited By The Debtor Do Not Dictate A Different Result.

The Debtor relies primarily on a Wisconsin case, *In re Eiler,* in support of his argument that unless a reaffirmation agreement specifically mentions an existing

---

[16] With respect to each of the Reaffirmation Agreements, the Debtor's attorney also certified that "the debtor is able to make the required payment." (Reaff. Agts., Part IV.)

arrearage, the reaffirmation agreement should be interpreted as modifying the original repayment schedule even if it generally incorporates the terms of the original agreement. 390 B.R. 920, 925 (Bankr. E.D. Wis. 2008).  That case involved an objection to a mortgage claim filed in a subsequent chapter 13 on a mortgage debt reaffirmed in a chapter 7 case the year before.  Similar to the reaffirmation agreements at issue here, the reaffirmation agreement in *Eiler* stated a specific monetary amount reaffirmed as of the date of the agreement, stated that repayment was to be "[a]s per original note," listed as "None" any changes to the credit agreement made as part of the reaffirmation agreement, and listed as a fixed monetary figure the monthly payment to be made going forward, which tracked the underlying agreement.  Like in this case, as of the date of the reaffirmation agreement, the debtors were several months behind on their payments.  But unlike in this case, the reaffirmation agreement in *Eiler* listed the first payment under the terms of the reaffirmation agreement to come due 5 days *after* the agreement was filed with the court.  The court concluded from the terms of agreement that "[n]o provisions were made in the reaffirmation agreement regarding any arrearage." *Id.* at 924.  The court also stated that since the amount stated as reaffirmed "was quantified and detailed, without any mention of arrearage, this supercedes the general statement elsewhere in the agreement that no changes were made to the loan agreement or payment schedule." *Id.* at 925.

This case is easily distinguishable from *Eiler* because the reaffirmations at issue here were not silent with respect to arrearage.  While they did not specifically

use the term "arrearage," they each stated that the monthly payments were to commence on a date corresponding to the first missed payment in the pending arrears. This commencement date was before the date the reaffirmation agreement was signed and was sufficient under the circumstances to indicate that the missed payments remained due and owing.[17]

Nor does *Eiler* stand for the proposition that by failing to mention a current arrearage that portion of the debt is permanently eliminated. Indeed, the court specifically held that, other than the modification of the payment schedule with respect to arrears, the "other provisions in the note which were not specifically modified by the reaffirmation agreement remain enforceable." *Id.* The court did find that the creditor had violated the discharge by demanding lump sum payments contrary to the court's interpretation of the reaffirmation agreement. But the court did not disallow the creditor's claim for principal and interest. Instead, the court only ruled that as "a sanction for . . . violation of the discharge injunction for its attempts to collect a[n] obligation in excess of what was due following discharge, the portion of [the creditor's] claim consisting of attorney's fees and costs shall be denied." *Id.* at 926. The court then reduced the creditor's total claim from $102,987.35 to $98,879.89, a reduction that was slightly less than the $4,878.60 in attorney's fees and costs

---

[17] This court need not decide whether the pending arrears would have been deferred had the agreement not expressly incorporated them through the retroactive payment commencement date or otherwise. *But see, e.g., Chandler*, 2018 WL 1473800, at *6 (stating that if the agreement was intended to "reset" payment schedule or eliminate responsibility to make payments, it would not have been silent). Nor need the court determine how such deferred arrearages would be repaid – whether as part of a balloon payment at the original maturity date, through an extension of the maturity date, or otherwise, or how and whether interest would accrue on unpaid amounts or alter the original payment schedule. The court in *Eiler* did not need to address these issues, and this court need not address them today, either.

itemized in the proof of claim. *Id.* at 922.   The fact that this allowed claim of

$98,879.89 exceeded the stated reaffirmation amount of $92,601.31 also makes clear

that when the court stated that "the amount of the obligation was fixed, whether

intentionally or not" by the reaffirmation agreement, the court did not mean that the

debt was permanently capped at such amount. *Id.* at 925.

The court also is not persuaded by the Debtor's reference to *In re Kasper* for

the proposition that "[g]enerally, as long as the debtor is in compliance with the

reaffirmation agreement, it may be anticipated that under that agreement the

lienholder foregoes enforcing its lien pursuant to a default that existed prior to

entering into the agreement." 309 B.R. 82, 97-98 (Bankr. D.D.C. 2004).   That case,

which pre-dates the 2005 Bankruptcy Code amendments, involved a so-called "ride-

through" option, as the debtor had not elected to surrender or redeem a vehicle or

reaffirm the secured debt.   Because the debtor had not reaffirmed the debt in

question, the cited proposition is dicta.[18]  Additionally, *Kasper* does not hold that

reaffirmation agreements will always provide for waiver of default, but only that most

debtors will not agree to enter into a reaffirmation agreement if the debtor does not

have the ability to cure the default without a provision for such waiver.   Indeed, the

court elaborated that if "the agreement does not so provide, the debtor would usually

not enter into the agreement absent some special benefit (such as the lienholder's

---

[18] Similarly, a footnote in *In re Edwards* with no analysis or explanation states that "Reaffirmation would also cure all past defaults." 901 F.2d 1383, 1384 n.3 (7th Cir. 1990).  But *Edwards*, too, involved the pre-2005 issue of whether debtors had a "ride-through" option to keep vehicle collateral without redeeming or reaffirming the debt.  Because the debtor had not reaffirmed the debt, the footnote is dicta.  It is also unclear if the Court merely meant that a debtor and lender *could agree* through a reaffirmation to the cure or waiver of defaults, as opposed to the Debtor's argument that reaffirmation will *always* cure defaults in the absence of express language to the contrary.

agreement not to enforce its claim against a parent of the debtor who guaranteed the debt), and, moreover, the agreement might fail to pass muster because it is viewed as imposing an undue hardship on the debtor." *Id.* at 98 n.23.

## IV. CONCLUSION

Finding there to be no genuine issue of material fact, the court will enter summary judgment in favor of State Bank and declare as follows:

(A)  With respect to Count I of the Adversary Complaint, each of the Reaffirmation Agreements fixed the amount of debt reaffirmed at the amounts stated therein as of the date of the Disclosure Statement listed in Part I.B. of the agreement, plus any amounts that accrued on such amount after such date under the terms of the underlying note and mortgage;

(B)  With respect to Count II, each of the Reaffirmation Agreements incorporated the repayment terms of the underlying note and mortgage without waiving any existing default or extending the repayment schedule or maturity date, and as such the failure to cure any payment default prior to the effective date of the Reaffirmation Agreement constituted a default under the agreement as of its effective date; and

(C)  With respect to Count III, the amount of any "arrearage" included within the amount of debt described as the "Amount Reaffirmed" in Part I.B. of the Reaffirmation Agreements as of the date of the Disclosure Statement stated in such part was reaffirmed and is not subject to the discharge the Debtor

received in this case.  Any interest or fees which accrued prior to such date but which were not included in such amount were not reaffirmed.

For the reasons set forth above, the Debtor's Motion for Summary Judgment will be denied and State Bank's Motion for Summary Judgment will be granted.  A separate order shall be entered to give effect to the determinations reached herein.

DATE: February 1, 2021

ENTER:

_____

Thomas M. Lynch
United States Bankruptcy Court